Under The Civil Rights Act, 42 U.S.C. § 1983

In The United States District Court
For The District of Delaware

Donald J. Thompson        326474
(Plaintiff name)      (inmate no.)
1181 Paddock Rd.   Smyrna, DE 19977
(address)

08-195

v.

(case no.)

1. Scott E. Kasprenski
2. Phillip A. Dunning
3. Donald Pierce
4. David Holman
5. Thomas Carroll
6. Delaware Correctional Center
7. Delaware Correctional Center Insurance Provider (Agency name unknown)
(names of defendants)

CIVIL COMPLAINT

·· Jury Trial Requested

FILED
APR - 7 2008
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

I. Previous Lawsuits

A. The plaintiff filed a § 1983 lawsuit in March of 2005 but before any litigation or the payment of any filing fees the plaintiff decided not to pursue the lawsuit b/c his complaint had had been addressed. The plaintiff does not know the caption or the case number or if a judicial officer was assigned to the case.

II. Jurisdiction and Venue

A. This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state of law, of rights guaranteed by the 8th amendment of the U.S. Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

B. This cause of action arose in the District of Delaware. Therefore, venue is proper under 28 U.S.C. § 1391(b).

III. Exhaustion of Administrative Remedies

I have fully exhausted all available administrative remedies.

The prison system gives you 7 days from the date of the incident to file a grievance. I filed a grievance on February 9, 2007 for the events that transpired on February 7, 2007. The grievance was accepted and the investigator was Major David Holman, the head of security at the prison. I received no word on the grievance for over 10 months. On December 17, 2007 I sent a letter to Captain Michael McCreanor, whom staff members said deals with the status and resolution of grievances, and asked if there was a resolution yet or if I could help further the process in any way. I received no response. The grievance no. is 100223.

I filed a grievance the same day for the medical charge that I received on February 20, 2007. I received a hearing for the grievance on April 30, 2007. The medical hearing board decided to refund me $2

but not the full $8. They asked me if I wanted to appeal and I said yes. They gave me the necessary paperwork, I filled it out and placed it in the mail on May 1, 2007. The prison system gives you 3 days from the date of the hearing to mail off the appeal paperwork. After mailing out the appeal, I have not heard anything. The grievance no. is 102083.

I filed a grievance the same day for the incident that occurred on February 25, 2007. On March 28, 2007 I received a reply ruling it non-grievable. The grievance was still given a number, 102550. I have a copy of the inmate handbook and grievance forms. It should be noted that neither state how an inmate is to appeal an issue ruled non-grievable. The policies of the prison, other than those stated in the handbook, are unavailable to inmates b/c of security concerns. Still, the next day on March 29, 2007 I sent a letter to Maj. David Holman, the head of security and the investigator for the first grievance that I filed on CO. Kasprenski. I appealed the ruling that the issue was non-grievable and the issue itself to Maj. Holman. I explained everything and asked for his help in the matter. I further stated that if he was not the person that could help me in the matter than to forward my letter to the correct person. I received no response.

IV. Defendants

1. Scott E. Kasprenski
   Employed as a Correctional Officer at the Delaware Correctional Center.
   Home mailing address unknown.

Last known work address: Delaware Correctional Center,
  1181 Paddock Rd. Smyrna, Delaware 19977.

2. Phillip A. Dunning
  Employed as a Correctional Officer at the Delaware Correctional Center.
  Home mailing address unknown
  Last known work address: Delaware Correctional Center,
  1181 Paddock Rd. Smyrna, Delaware 19977.

3. Donald Pierce
  Employed as the Deputy Warden at the Delaware Correctional Center.
  Home mailing address unknown
  Last known work address: Delaware Correctional Center,
  1181 Paddock Rd. Smyrna, Delaware 19977

4. David Holman
  Employed as Major, head of security at the Delaware Correctional Center.
  Home mailing address unknown
  Last known work address: Delaware Correctional Center,
  1181 Paddock Rd. Smyrna, Delaware 19977.

5. Thomas Carroll
  Employed as Warden at the Delaware Correctional Center.
  Home mailing address unknown
  Last known work address: Delaware Correctional Center,
  1181 Paddock Rd. Smyrna, Delaware 19977.

6. Delaware Correctional Center
  The prison institution
  address: 1181 Paddock Rd. Smyrna, Delaware 19977

7. Delaware Correctional Center Insurance Provider
Agency name and address unknown.

All defendants named in this suit are being sued in both their individual and official capacities.

V. Statement of Claims

The defendant's listed on this claim are liable for one or more of the following violations of the plaintiff's rights:

- 8th amendment protection against cruel and unusual punishment.

- Right to be free from assault and battery.

- Right to be free from discrimination b/c of race.

- Breach of duty to protect.

- Right to be free from verbal harassment and psychological torture.

- Deliberate indifference to the plaintiff's assault and injuries during and/or after the fact.

- Right to be free from retaliation for reporting violation of the plaintiff's rights.

Statement of Claims (Cont.)

Facts of the Case

On February 7, 2007 the plaintiff, inmate Donald Thompson, was being escorted by C.O. Scott E. Kasprenski and C.O. Phillip A. Dunning from Bldg. 24 back to housing unit Bldg. 21. The plaintiff was in Bldg. 24 to speak with Lt. Michael Welcome about a write-up that he received from C.O. Kasprenski. C.O. Kasprenski was very angry b/c of what the plaintiff told Lt. Welcome regarding C.O. Kasprenski's conduct during the incident in the write-up and raising questions as to his veracity about the incident. Once inside the slider doors entering Bldg. 21, away from the camera that observes the walkway, C.O. Kasprenski pushes the plaintiff with his right hand, fully extending his right arm. The plaintiff was secured in ankle shackles and a standard set of handcuffs that was attached to a chain bound tightly around the plaintiff's waist, thus immobilizing his hands. B/c of the force of the push and the restraints, the plaintiff loses his balance, stumbles back and almost falls down but C.O. Dunning, who was behind the plaintiff, stopped his fall. When the second slider door opened, C.O. Dunning ushered the plaintiff through with him in front and C.O. Kasprenski behind the plaintiff. As the plaintiff was going through the door C.O. Kasprenski grabbed him and slammed him against the wall. When he was thrown against the wall he was pulled faster than the restraints allowed; b/c of this the shackles cut into his legs and bruising the bone and ankle area. C.O. Kasprenski lifted the plaintiff up against the wall until the plaintiff was standing on his toes by cupping the plaintiff's face with his left hand and lifting while choking the plaintiff with his right hand. While still choking the plaintiff, C.O. Kasprenski said "You wanna do something? You wanna do something? You don't know what a real man is nigger".

Statement of Claims (Cont.)

During all of this C.O. Dunning was still present but did nothing to stop it. The plaintiff could not attempt to loosen C.O. Kasprenski's grip b/c the plaintiff's hands were bound to his waist. The plaintiff could not breath and his eyes began to water. As the plaintiff looked in the direction of the control room he sees C.O. Jesse Hambright and tried to call him for help. When C.O. Kasprenski looked back and saw C.O. Hambright looking to see what was going on, he let the plaintiff down and began jerking the plaintiff by the waist chain while pushing and shoving him down the hall. The restraints were still cutting into his wrist and ankles b/c of the speed and violent way in which the plaintiff was made to move. As C.O. Kasprenski was doing this, the plaintiff looked back down the hall. He sees Sgt. Robert L. Cain coming around the corner and began calling to him for help. Sgt. Cain saw what C.O. Kasprenski was doing to the plaintiff and when he yelled to Sgt. Cain for help, C.O. Kasprenski tried to quickly push the plaintiff down the hall and into the slider door that entered the housing tier so Sgt. Cain would not become involved. But Sgt. Cain got there before the slider door closed and told C.O. Kasprenski to stop. C.O. Kasprenski refused to follow Sgt. Cain's direct order and continued to jerk and shove the plaintiff by the waist chain while inside the sliders. Sgt. Cain again told C.O. Kasprenski to stop but he still refused to listen. Sgt. Cain then grabbed the other side of the waist chain, to hold the plaintiff in place and stop C.O. Kasprenski from jerking the plaintiff by the waist chain, and again told C.O. Kasprenski to stop and let go of the waist chain. C.O. Kasprenski then pushed Sgt. Cain so that he would let go of the waist chain, at which point Sgt. Cain tells C.O. Kasprenski not to push him. When the slider to the housing tier opened, Sgt. Cain said to

Statement of Claims (Cont.)

C.O. Kasprenski that he would secure the plaintiff in his cell and that C.O. Kasprenski was to remain inside the sliders and not to come on the housing tier. As Sgt. Cain and C.O. Dunning escorted the plaintiff to his cell, the plaintiff was explaining to Sgt. Cain what happened. C.O. Kasprenski tried to interrupt, at which point Sgt. Cain again tells C.O. Kasprenski to remain inside the sliders and do not come on the housing tier. Sgt. Cain then removed the plaintiff's restraints and secured him in his cell. The wall that separates the housing tier from the Bldg. hallway is glass so that staff can monitor activities on the tier. B/c of this, other inmates were also able to witness the incident. Among those who witnessed the incident were the occupants of the cell next to the plaintiff. They told the plaintiff what they had seen and then told the plaintiff to quickly look out his cell window. The plaintiff saw Sgt. Cain and C.O. Kasprenski arguing in the hallway. Sgt. Cain was animated and looked very upset. The occupants of the cell next to the plaintiff were Kevin Coleman (461593) and Jawan Colson (380388).

Later that night, during the plaintiff's recreation period, other inmates said they saw what had happened as well, including Christopher J. Miller (238238 cell DL4) and Benny Pelfrey (325998 cell DU4), so the plaintiff wrote down their names. The plaintiff was also allowed a phonecall during this period. He calls his family, who then calls the prison regarding the incident and the plaintiff's injuries. The plaintiff is later taken from his cell by Staff Lt. Stephen W. Boone and Sgt. Casey Phelps to see the 4-12 shift nurse, Jane Doe, to insure that the plaintiff had no life threating injuries. The plaintiff was then taken to Staff Lt. Boone's office in Bldg. 24 where he gives a written statement and pictures are taken of all of his injuries, including cuts and

Statement of Claims (Cont.)

bruises to the plaintiff's ankles, wrist, and neck. Afterward the plaintiff was taken back to his cell.

On Feb. 8, 2007 at about 8:30 am the plaintiff was taken from his cell to give a tape recorded statement to the Internal Affairs investigator, Mr. Joe Richardson. Pictures was also taken of the plaintiff's visible injuries, including the socks that the plaintiff was wearing on the day of the incident, which were bloody from the damage to his ankle. Mr. Richardson then interviewed every inmate on the tier about what they saw. All of their statements were taped recorded as well. While this is happening, the plaintiff is taken to Bldg. 24 to see the doctor, Jane Doe. She examined the plaintiff's injuries, asked about the plaintiff's symptoms, and made her report. She told the plaintiff that he had something similar to whiplash regarding the problems and pains in his neck. She prescribed muscle relaxers, muscle rub gel, and Motrin (which later had to be increased in strength) for about two months. The doctor also said that the pain in the plaintiff's ankle was probably a bone bruise and that b/c of the pain, cuts, and swelling, she would submit a request for the plaintiff to be excused from wearing ankle shackles for a period of time. The time, as marked on the request, was from Feb. 8, 2007 - Feb. 13, 2007. On Feb. 27, 2007 the plaintiff received a copy of the denial of the doctor's request. The denial came from and was signed by Deputy Warden Donald Pierce. Dep. Warden Pierce didn't process the request until Feb. 15, 2007, which was two days after the period requested for had expired. The plaintiff had to wear ankle shackles during any type of transit, whether voluntary, such as visits, or involuntary such as medical appointments or other reasons for transit. This caused the plaintiff increased pain in his ankle and increased the time necessary for the injuries to heal.

Statement of Claims (Cont.)

On Feb. 20, 2007 the plaintiff was taken to see the doctor again. She did a follow-up on his injuries, checked his neck, ordered a refill for his prescriptions for Motrin and muscle relaxers, and ordered X-rays on his neck. After it was over, the plaintiff was charged $8 for the follow-up visit. The prison should absorb this cost since the plaintiff's injuries are a direct result of the misconduct of a prison staff member.

On Feb. 25, 2007 at 9:20 am the plaintiff was awakened by his cell door opening and C.O. Holmes and C.O. John Doe asking the plaintiff and his cellmate, Darnell Pierce (372220), to step outside the cell for a shakedown. An inmate's hands must be cuffed before he steps out of the cell for a shakedown. After the plaintiff's hands were cuffed behind his back, he stepped outside the cell and saw C.O. Kasprenski and another C.O., J. Boone, standing on the side where the plaintiff could not see them from inside the cell. When the plaintiff saw C.O. Kasprenski, he took a step back in the cell, becoming more awake, alert, and fearful. C.O. Kasprenski asked the plaintiff if there was a problem. The plaintiff did not respond. C.O. John Doe asked the plaintiff to step out of the cell. The plaintiff comes out but instead of standing by the cell, the plaintiff goes over and stands by the glass wall that separates the housing tier from the Bldg. hallway, where other people could see him if something happened. C.O. Holmes and C.O. John Doe conducted the shakedown while C.O. Kasprenski, C.O. Boone, and inmate Pierce stood just outside the cell door. At one point, the plaintiff was called back over to his cell to identify an item. While the plaintiff is in front of the cell door, C.O. Kasprenski takes a step toward him from his right side, taunting and attempting to intimidate the plaintiff. C.O. Kasprenski then said "How's your ankle? How's your ankle? It looks fine to me." The plaintiff said that he would be sure to write down

Statement of Claim (Cont.)

C.O. Kasprenski's comment. The plaintiff stated this loudly to insure that everyone present was aware of what was going on. The plaintiff then turned to C.O. Boone and asked who was it that decided to shakedown his cell. C.O. Kasprenski jumped in and said Staff Lt. Profaci ordered the whole tier to be shook down. Inmate Pierce says to C.O. Kasprenski "He's not talking to you." C.O. Kasprenski says to inmate Pierce "Well I'm not talking to you." The plaintiff then speaks up and says that he does not want to speak with C.O. Kasprenski. The plaintiff did not want anything to escalate and so after this exchange the plaintiff goes back over and stands by the glass wall. While standing there, the plaintiff can see C.O. Lucus, who regularly works on the plaintiff's housing tier, in the control room. He tries to communicate with C.O. Lucus, and ask him who the Sgt. in charge of the Bldg. was. C.O. Kasprenski again interrupts and says "Here's the Sgt. in charge. You want to speak to him, there he is right there". As he approached me he was pointing back at C.O. Boone, who was still in front of the cell door. C.O. Boone wore the standard blue uniform with no stripes or other indications of rank. The lack of stripes on the uniform identify the wearer as a regular C.O. The plaintiff walked back over to C.O. Boone and asked him if he was the Sgt. in charge. C.O. Boone said "I'm just here". That was not a definite answer so the plaintiff is unaware of what his rank and status is. If he was the Sgt. he was unwilling to address the plaintiff's concerns or assert any control over the situation. When the shakedown was done, as the plaintiff was stepping back in his cell, C.O. Kasprenski asked the other C.O.'s if the plaintiff had been patted down. Then, with the plaintiff's hands still cuffed behind his back, C.O. Kasprenski initiated a patdown search on him. The plaintiff was alarmed and nervous. When C.O. Kasprenski started patting around the plaintiff's

Statement of Claim (Cont.)

private parts, the plaintiff becomes tearful and pulls away, stating loudly that he feared for his safety. C.O. Kasprenski laughed at the plaintiff and taunted him for making this statement, but did not attempt to continue the pat-down search. The plaintiff's handcuffs were taken off and he was locked inside his cell. C.O. Kasprenski's actions that day were done deliberately to intimidate and strike fear in the plaintiff and to let the plaintiff know that at any time he could get to the plaintiff. The plaintiff was placed in a dangerous environment where he was in restraints and in the presence of an individual, C.O. Kasprenski, who had previously assaulted him and placed the plaintiff in immense fear. B/c of the grievance filed by the plaintiff and the Internal Affairs investigation, all proper supervisory officials, including Warden Carroll, Dep. Warden Pierce, and head of security Maj. Holman, knew about the problems between C.O. Kasprenski and the plaintiff. C.O. Kasprenski was not reassigned, nor were restrictions placed on contact between C.O. Kasprenski and the plaintiff.

    On March 9, 2007, X-rays were taken of the plaintiff's neck. On April 11, 2007 the plaintiff received a copy of the X-ray results. It didn't say much except that the results were "within acceptable limits" and that the plaintiff was scheduled for a follow-up with the doctor. On April 16, 2007 the plaintiff saw the doctor. She was explaining the X-ray report to him but her report looked very different than his. Her report was very wordy and had a lot of medical terms that the plaintiff did not understand. He did understand parts of it, like when it mentioned a reversal of the spinal curve in his cervical spine, and other key words like irritation, which were in the doctor's version of the X-ray results but not his.

Statement of Claim (Cont.)

The plaintiff asked why her report was different from his and pointed out specific problems and areas as oppose to his copy which simply stated the X-ray results were "within acceptable limits". She said she didn't know why. She said the X-rays showed that the damage is to the plaintiff's neck muscles and that his spine is unaffected. The plaintiff then asked if that were true then why is his spinal curve reversed. The doctor said that b/c of the tightness, irritation, ect. that it was affecting the curve in his spine. The plaintiff then stated "so basically the problems in my neck muscles is causing problems and this reversal of the curve in my spine". She said correct. The plaintiff asked if it said as much in her X-ray report. She said yes. The plaintiff then asked if he could have a copy of her report. She said no and that if he gets out of jail his doctor on the street can request for his medical records. The plaintiff finds it strange he is not permitted to have a true and accurate copy of his own X-ray results if there is not anything to hide.

In addition to the plaintiff's physical injuries, the plaintiff also suffered extreme mental and emotional distress and was placed in a constant state of anxiety and fear. The plaintiff was unable to sleep b/c of his mental and emotional as well as his physical injuries and he lost weight. The plaintiff met with the prison mental health counselor to discuss his difficulty dealing with the situation, including the following dates: February 12 & 28, in which she said that the plaintiff has some type of post tramatic stress and that she would find out why C.O. Kasprenski was still permitted around the plaintiff given the history between them.

## VI. Relief

WHEREFORE, the plaintiff, Donald J. Thompson, prays for judgment in his favor and damages in his favor against all defendants in an amount sufficient to compensate him for the physical pain and mental and emotional anguish suffered by him due to the deliberate indifference and intentional misconduct of the defendants, reimbursment of court cost and filing fees, reimbursment for medical bills and payments, but in no event less than $300,000, together with any attorney's fees and cost. The plaintiff also wants a therapeutic pillow for his head and neck, rehabilitation treatment for his neck injury, and any such additional relief as the Court may deem just and proper.

Respectfully Submitted,

*Donald J. Thompson* (signature)

Donald J. Thompson
1181 Paddock Rd.
Smyrna, DE. 19977

Signed this 31 day of March, 2008

I declare under penalty of perjury that the foregoing is true and correct.

